**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MAURICE ATKINSON,** | : | |
| **Petitioner** | : | **No. 1:14-cr-00070-8** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| **Respondent** | : | |

## MEMORANDUM

Before the Court is Petitioner Maurice Atkinson ("Petitioner")'s motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (Doc. No. 1752.) For the following reasons, the Court will deny the motion.

## I.    BACKGROUND

On September 17, 2014, a federal grand jury returned a superseding indictment charging Petitioner and twenty (20) codefendants (collectively, "Codefendants," and with Petitioner, "Defendants") with three counts: racketeering conspiracy ("RICO") (Count 1), drug-trafficking conspiracy (Count 2), and drug trafficking (Count 3).[1] (Doc. No. 78.) The superseding indictment arose from allegations that Petitioner and his codefendants were associated with a violent street gang—the Southside gang, which is affiliated with the Bloods, a national street gang—and engaged in drug trafficking and other violent acts. (Id.) The conspiracy took place over a twelve-year period and involved deadly gang violence. (Id.) Nine defendants entered pleas of guilty, but twelve, including Petitioner, proceeded to a joint jury trial. See (Doc. No. 974–1027). The jury found all twelve guilty, in late 2015, of one or more charges. (Doc. Nos. 911–34.)

---

[1]    Four (4) Codefendants were also charged with firearm-related offenses. (Doc. No. 78.)

As to Petitioner, the jury found him guilty of RICO (Count 1) and the two drug counts (Counts 2–3), which involved 5 kilograms or more of cocaine and 280 grams and more of crack cocaine, heroin, and marijuana. (Doc. No. 921.) The presentence investigation report ("PSR") assigned a base offense level of 43 for the RICO conviction (Count 1) based on underlying racketeering activity for which Petitioner was deemed responsible pursuant to U.S.S.G. § 2A1.1(a).[2] (PSR ¶ 211.) The PSR indicated that the RICO conviction carried a statutory maximum of life imprisonment pursuant to 18 U.S.C. § 1962(d). (Id. ¶ 358.) The guideline range was also calculated based on the total offense level of 43 and a criminal history category of VI. (Id. ¶ 359.) Regarding the underlying racketeering activity that resulted in the higher statutory maximum and guideline range, the PSR stated as follows:

> The instant RICO offense encompasses five separate underlying racketeering categories, and 109 Racketeering Activities (RA) as referenced in The Offense Conduct section of this report. Maurice Atkinson was involved in the RICO offense the entire time and is therefore responsible for the following Racketeering Activities:
>
> Murder
> Acts – 11, 44, 46, 78, 81, 86, 101
>
> Attempted Murder
> Acts – 15, 16, 19, 26, 28, 29, 30, 32, 33, 34, 35, 36, 37, 41, 42, 43, 45, 48, 53, 61, 65, 66, 67, 70, 71, 72, 73, 74, 75, 76, 77, 80, 82, 83, 84, 85, and 87
>
> Robbery
> Acts – 13, 68, 79
>
> Kidnapping
> Act – 31
>
> Narcotics Possession/Delivery
> Acts – 1-9, 10, 12, 14, 17, 18, 20, 21, 22, 23, 24, 25, 27, 38, 39, 40, 47, 49, 50, 51, 52, 54, 55, 56, 57, 58, 59, 60, 62, 63, 64, 69, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 102, 103, 104, 105, 106, 107, 108, and 109

---

[2] U.S.S.G. § 2E1.1 provides for a base offense level of 19 "unless the offense level applicable to the underlying racketeering activity is greater." See U.S.S.G. § 2E1.1.

(Id. ¶ 210.)  The Court sentenced Petitioner to concurrent terms of life imprisonment on Counts

1, 2, and 3.  (Doc. No. 1406 at 3.)

Petitioner and nine Codefendants who proceeded to trial appealed their convictions and

sentences to the United States Court of Appeals for the Third Circuit ("Third Circuit").  See

United States v. Williams, 974 F.3d 320, 338 (3d Cir. 2020).  The Third Circuit grouped their

claims on appeal into five (5) categories: (1) Sixth Amendment challenges to this Court's closure

of the courtroom to the public during voir dire; (2) challenges to the Court's in camera

disposition of a challenge asserted under Batson v. Kentucky, 476 U.S. 79 (1986); (3)

evidentiary challenges relating to motions to suppress evidence recovered from their residences

under search warrants; (4) challenges to the sufficiency of evidence at trial; and (5) challenges to

their sentences based on alleged procedural defects.  See id. at 335–36.  Petitioner challenged the

Court's two-day closure of the courtroom to the public during jury selection  which was based on

courtroom capacity limitations.  See Williams, 974 F.3d at 340–49.  Because none of the

numerous defense attorneys involved in these criminal proceedings objected to the courtroom

closure, the Third Circuit reviewed for plain error under the framework of United States v.

Olano, 507 U.S. 725, 732 (1993).[3]  Noting the Government's concession that the Court's order

closing the courtroom was an "error" that was "plain," the Third Circuit found it unnecessary to

address the third Olano prong (whether an error affects substantial rights) because, as to the

---

[3]  In Olano, "the Supreme Court [] described a four-part inquiry for plain-error review.  There
must: (1) be an 'error' that (2) is 'plain' and (3) 'affects substantial rights.'"  See Williams, 974
F.3d 320, 340 (3d Cir. 2020) (quoting Olano, 507 U.S. at 732 (quoting Fed. R. Crim. P. 52(b))).
"If these three conditions are satisfied, then it is within the sound discretion of the court of
appeals to correct the forfeited error—but only if (4) the error seriously affects the fairness,
integrity or public reputation of judicial proceedings."  Id. (quoting Olano, 507 U.S. at 732)
(internal quotation marks omitted).

fourth Olano prong, the error of closing the courtroom during jury selection to all but court personnel, Defendants, trial counsel and support staff, and prospective jurors "did not 'seriously affect the fairness, integrity or public reputation of judicial proceedings . . . .'" See Williams, 974 F.3d at 341 (quoting Olano, 507 U.S. at 736).

While affirming all ten Defendants' judgments of conviction, and based on the Government's concession, the Third Circuit partially vacated the judgments of sentence of eight Defendants "as to the assessment of police overtime costs," vacated the judgment of sentence of one of those eight Defendants—Hernandez—in full to permit him an opportunity to make a statement or present mitigation evidence in connection with his sentencing proceedings, and vacated another of the same group of Defendants—Scheug—as to the assessment of restitution, fines, and costs. See id. at 375, 377, 380; see also (Doc. Nos. 1637, 1637-1, 1638, 1638-1, 1639, 1639-1, 1640, 1640-1, 1641, 1641-1, 1642, 1642-1, 1643, 1643-1, 1644, 1644-1, 1645, 1645-1, 1646, 1646-1).

In October 2021, this Court issued orders effectuating the vacatur of five Defendants' judgments of sentence as to the assessment of police overtime costs and entered corresponding amended judgments. (Doc. Nos. 1684–85 (Cruz), 1687–88 (Kelly), 1690–91 (Villega), 1693–94 (Petitioner), 1696–97 (Sistrunk).) In December 2021, following sentencing hearings, the Court resentenced Defendants Hernandez and Schueg and issued amended orders regarding their judgments of sentence. (Doc. Nos. 1705, 1709 (Schueg), 1711–12 (Hernandez).)[4]

Petitioner filed his pending § 2255 motion and a supporting brief in October 2022 (Doc. Nos. 1752–53), and subsequently filed a Notice of Election—in response to the Court's Miller

---

[4]  An amended judgment was not entered as to Defendant Eatmon, whose judgment of sentence was ordered vacated as to the police overtime costs, because his original judgment did not include such costs. See (Doc. No. 1504).

notice—indicating that he wished to have the motion ruled on as filed (Doc. Nos. 1760, 1781).

The Government filed a brief in opposition in November 2022 (Doc. No. 1802), and Petitioner

filed a reply brief in December 2022 (Doc. No. 1817).  Having been fully briefed, Petitioner's

§ 2255 motion is ripe for disposition.

## II.     LEGAL STANDARD

Under 28 U.S.C. § 2255(a), a federal prisoner may file a motion requesting that the

sentencing court vacate, set aside, or correct his sentence on the basis "that the sentence was

imposed in violation of the Constitution or laws of the United States, or that the [C]ourt was

without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum

authorized by law, or is otherwise subject to collateral attack."  See 28 U.S.C. § 2255(a).

However, § 2255 does not afford a remedy for all errors that may have been made at trial or

during sentencing.  See United States v. Essig, 10 F.3d 968, 977 n.25 (3d Cir. 1993) (citing

United States v. Addonizio, 442 U.S. 178, 185 (1979)).  Rather, § 2255 is implicated only when

the alleged error raises "a fundamental defect which inherently results in a complete miscarriage

of justice."  See Addonizio, 442 U.S. at 185.  Under the Antiterrorism and Effective Death

Penalty Act ("AEDPA"), a petitioner has one year from the time his conviction becomes final to

file a § 2255 motion.  See 28 U.S.C. § 2244.

## III.    DISCUSSION

Petitioner advances the following eight grounds—all but one alleging ineffective

assistance of counsel—in support of his § 2255 motion:

> (1)    Trial Counsel was ineffective for failing to object to the Court's closure of
> the courtroom during voir dire;

> (2)    Appellate Counsel was ineffective because Appellate Counsel "completely
> confused his presentation concerning the facts of record to meet the
> challenge of the obstruction of justice enhancement";

(3)    Trial Counsel was ineffective for failing "to object to the district court's jury instruction leading to an aggregation theory" under 21 U.S.C. § 841(A)(1);

(4)    Trial Counsel was ineffective for failing to object to the sentence imposed on Counts 1, 2, and 3, resulting in his life imprisonment based on the aggregation theory;

(5)    Trial Counsel was ineffective for failing "to investigate whether [the] jury pool represented a fair cross section of the community [p]rior to selecting the jury";

(6)    Trial Counsel was ineffective for "failure to object to the government's witnesses who testified in the capacity of expert testimony without adducing sufficient background information on their alleged specialized knowledge";

(7)    The District Court erred "when it used real conduct to enhance [Petitioner]'s sentence in violation of his rights to due process of law"; and

(8)    Trial Counsel was ineffective for failure "to conduct an adequate pretrial investigation, into the fines and [r]estitution."

(Doc. No. 1753 at 3–34.)

As his claims reflect, with the exception of his seventh claim, Petitioner seeks § 2255 relief based on the overarching assertion that his Counsel provided constitutionally deficient representation in violation of the Sixth Amendment. A collateral attack of a sentence based upon a claim of ineffective assistance of counsel must meet a two-part test established by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 687–88, 694 (1984). See George v. Sively, 254 F.3d 438, 443 (3d Cir. 2001). The first Strickland prong requires Petitioner to "establish first that counsel's performance was deficient." See Jermyn v. Horn, 266 F.3d 257, 282 (3d Cir. 2001). Petitioner must show that counsel made errors "so serious" that counsel was not functioning as guaranteed under the Sixth Amendment. See id. To do so, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. See id. (citing Strickland, 466 U.S. at 688). There is,

6

however, "a 'strong presumption' that counsel's performance was reasonable." See id.

Under the second Strickland prong, Petitioner "must demonstrate that he was prejudiced by counsel's errors." See id. Prejudice in this context means "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See id. (quoting Strickland, 466 U.S. at 694). Reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." See id. (quoting Strickland, 466 U.S. at 694).

Notably, Petitioner must make an adequate showing with respect to both prongs of the Strickland test in order to be entitled to relief. See Strickland, 466 U.S. at 686. A failure to make the required showing on either prong precludes a finding in Petitioner's favor. See id. at 700. "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible," courts should address the prejudice prong first when it is dispositive of a petitioner's claims. See United States v. Cross, 308 F.3d 308, 315 (3d Cir. 2002). The Court addresses each ground asserted in Petitioner's motion in turn below.

A.    **Ground One: Failure to Object to Two-Day Courtroom Closing**

Ground One of Petitioner's motion asserts that Trial Counsel was constitutionally ineffective for failing to object to the Court's decision to close the courtroom to the public for two days during voir dire. (Doc. No. 1753 at 8–9.) In this regard, the "Sixth Amendment requires that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial.'" See United States v. Gallman, 57 F.4th 122, 126 (3d Cir. 2023) (alteration in original) (quoting U.S. Const. amend. VI). Invoking this Sixth Amendment right, Petitioner argues:

Petitioner Atkinson's counsel was supposed to protect his Sixth Amendment right to a public trial. Petitioner Atkinson's counsel['s][] failure to object to the court closure of jury selection was prejudicial because the implementation of jury selection processes was structured as a safeguard [to] protect the defendant from judicial, government or individual deprivations against a defendant [][]'s freedom []—whether deliberate or other partiality.

This right has been enshrined in the Constitution for centuries and [the] Supreme Court has steadily provided guidance of law in protecting the importance of this constitutional provision. In Petitioner Atkinson's case there is a complete deprivation of the constitutional right. Here, the court [ ] closure unprompted and was done—so without any considerations of the laws to support the decision or factual basis.

(Doc. No. 1753 at 9–10.)

Conceding the first Strickland prong, the Government notes that for Petitioner to be successful, Petitioner must also establish prejudice under the second Strickland prong. (Doc. No. 1802 at 10.) The Government argues that Petitioner has failed to establish that he was prejudiced by Trial Counsel's failure to object to the closing of the courtroom during voir dire. (Id. at 11–16.) The Government observes that Petitioner "generally alleges prejudice" and that "[t]o the extent that he is arguing [the public's] presence would have changed the outcome of the proceedings, the claim is without merit." (Id. at 13.) The Government argues that the public was only excluded for two days of jury selection in what was a seven-week trial, there are public transcripts of the jury selection, and there is "no indication that any juror falsified information or would have otherwise been exposed as unqualified to serve" if the jury selection had been public. (Id. at 13–14.) Accordingly, the Government argues that Petitioner's failure to establish prejudice from Trial Counsel's failure to object to the courtroom closure compels the Court to deny his courtroom-closure-related claim. (Id. at 16.)

The Court has thoroughly reviewed the record and the parties' arguments and concludes that Petitioner has failed to satisfy the second Strickland prong. The Court notes at the outset

that controlling case law dictates that "closing voir dire" to the public does not automatically give rise to a presumption of prejudice under the relevant case law.  See Weaver, 582 U.S. at 294; Barney, 48 F.4th at 165; Baxter, 998 F.3d at 548.  Therefore, the issue of whether Petitioner has established prejudice turns on the circumstances under which the closure occurred.

Applying various factors identified by the Supreme Court and Third Circuit bearing on the issue of whether and the extent to which a courtroom closure causes prejudice, the Court finds that the circumstances here do not establish prejudice for purposes of Strickland's second prong.  In this case, as in Weaver, while "[i]t is . . . possible that potential jurors might have behaved differently if [the individuals who were prevented from viewing the trial] had been present" and that "the presence of the public might have had some bearing on juror reaction," Petitioner "offer[s] no evidence or legal argument establishing prejudice in the sense of a reasonable probability of a different outcome but for counsel's failure to object."  See Weaver, 582 U.S. at 303 (internal quotation marks omitted).  As the Third Circuit noted on appeal, "although the closure encompassed all of the jury-selection phase, those proceedings lasted only two days; the public had access to all other phases of the trial, which in total lasted longer than seven weeks."  See Williams, 974 F.3d at 346.  Further, "a transcript of the proceedings was produced and later disclosed," and "knowledge both of the media's attention to the trial and of the transcript's production (which ensures publicity in perpetuity) may have had a similar effect on the proceedings' participants as real-time public access would have had, keeping them 'keenly alive to a sense of their responsibility and to the importance of their functions.'"  See id. at 346–47 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)).  "In addition, although the general public was not, absent authorization, able to be present at jury selection, as in Weaver, 'there were many members of the venire who did not become jurors but who did observe the

proceedings.'" Id. at 347 (quoting Weaver, 582 U.S. at 304). There has, moreover, "been 'no suggestion of misbehavior by the prosecutor, judge, or any other party; and no suggestion that any of the participants failed to approach their duties with the neutrality and serious purpose that our system demands.'" See id. (quoting Weaver, 582 U.S. at 304).

The Court also finds persuasive the Government's arguments drawing, in part, on the Third Circuit's reasoning on the issue of prejudice. In its briefing, the Government argues:

> [Petitioner] simply cannot establish prejudice. He generally alleges prejudice and notes that there were members of the public who would have been present for jury selection. To the extent that he is arguing their presence would have changed the outcome of the proceedings, the claim is without merit.
>
> While a public trial can benefit the accused to the extent that "the presence of interested spectators may keep the defendant's trier keenly alive to a sense of their responsibility and to the importance of their functions," Williams, 974 F.3d at 346 (quoting Waller, 467 [U.S.] at 46), here the public was excluded for two-days of jury selection in a seven-week trial. The potential for prejudice is confined to the jury selection. The transcriptions of the jury selection were public. There is no indication that any juror falsified information or would have otherwise been exposed as unqualified to serve if the proceedings had been public. Nor is there evidence that the judge, prosecutors, or other court personnel engaged in misconduct during jury selection which would have been minimized or thwarted by a public proceeding.
>
> Additionally, there were at least twenty-five people in the defense camps who watched the jury selection process. This is a far cry from the normal public presence at jury selection. Due to the size of the venire panel and the number of defendants, the courtroom was packed with people. So, although the venire members do not qualify as the "public" for Sixth Amendment purposes, the distinction between members of the public and fellow venire members was probably lost on the individuals as they proceeded through jury selection. The combination of people in the packed courtroom, plus their oath and admonition that all they say was being stenographically recorded, placed sufficient social and legal pressure on each juror to answer honestly that the court should have confidence that allowing some members of the public to watch the proceedings would have changed nothing. This dynamic was only amplified by the twenty-five plus members of the defense camps who were present and scrutinizing the venire members. Any suggestion that a more public spotlight on jury selection would have resulted in a different jury is pure speculation. There is nothing to suggest that a different jury would have resolved this case differently.

(Doc. No. 1802 at 13–15.)

For these reasons—and based on the authorities and the Third Circuit's prior discussion of the circumstances of the courtroom closure—the Court concludes that Petitioner has not established that Trial Counsel's failure to object to the two-day courtroom closure during voir dire prejudiced him. Petitioner advances no argument that, but for Trial Counsel's failure to object to the closure, "the result of [his criminal] proceeding would have been different." See Strickland, 466 U.S. at 694. He argues Trial Counsel's "failure to object to the court's closure was prejudicial because the error was a fundamental constitutional right deprivation that affect[s] substantial rights not only of Petitioner[] but also the public." (Doc. No. 1753 at 13.) Petitioner generally alleges prejudice and notes that there were members of the public who would have been present for jury selection, but does not explain how their presence would have changed the outcome of the proceedings. (Id. at 14.) These allegations, when viewed under the standard and case law discussed above, do not establish Strickland prejudice resulting from the failure to object to the courtroom closure under the circumstances of this case, and the record is otherwise bereft of any indications of prejudice.[5] The Court will therefore deny Petitioner's motion as to Ground One.

---

[5] The Court in Weaver (and the Third Circuit in Baxter) assumed, without deciding, that prejudice from a structural error can be established by a showing of "fundamental unfairness." See Weaver, 582 U.S. at 301 ("[T]he burden is on the defendant to show either a reasonable probability of a different outcome in his or her case or, as the Court has assumed for these purposes, to show that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair." (emphasis added)); see also Baxter, 998 F.3d at 548 (assuming "that prejudice can be shown by a demonstration of fundamental unfairness" (quoting Weaver, 582 U.S. at 304)). But "not every public-trial violation will in fact lead to a fundamentally unfair trial," see Weaver, 582 U.S. at 298, and a two-day courtroom closure during voir dire, absent any additional circumstances suggesting fundamental unfairness, does not, in the Court's view, satisfy the prejudice prong of Strickland here.

**B.      Ground Two: Failure to Respond to Court's Imposition of a Sentencing Enhancement Based on the Obstruction of Justice**

Ground Two of Petitioner's motion asserts that his Appellate Counsel was constitutionally deficient for failing "to investigate or set forth an argument" (Doc. No. 1753 at 14), responding to the Court's imposition of an obstruction of justice sentencing enhancement related to Petitioner's alleged assault on another inmate prior to sentencing.  The challenged sentencing enhancement for obstruction of justice relates to Petitioner's stabbing of Carl Hodge in Dauphin County Prison.  (PSR ¶ 266.)  At sentencing, Petitioner's Trial Counsel argued that the Government could not make a connection between Petitioner's action (stabbing Hodge) and Hodge's status as a government informant.  (Doc. No. 1413 at 52–53, Tr. 52:3–53:21.)  The Court did not agree and applied the two-level adjustment to Petitioner's sentence.  (Doc. Nos. 1406–07.)

Although a defendant decides whether to pursue an appeal, "the choice of what specific arguments to make within that appeal belongs to appellate counsel."  See Garza v. Idaho, 586 U.S. 232, 240 (2019).  A defendant has no constitutional right to compel counsel to "press nonfrivolous points" if counsel, "as a matter of professional judgment, decides not to present those points."  See Jones v. Barnes, 463 U.S. 745, 751 (1983).  Petitioner argues that Appellate Counsel "completely confused his presentation concerning the facts of the record to meet the challenge of the obstruction of justice enhancement pursuant to U.S.S.G. [§] 3C1.1" and that Petitioner advised Appellate Counsel accordingly.  (Doc. No. 1753 at 18.)  He states that his claim:

> was supposed to be presented straight-forward and was supported by Defendant Hodge's secret agreement with the government, in that, Petitioner Atkinson had no knowledge of Defendant Hodge's cooperation status, there is no evidence of communication between Petitioner Atkinson and his co-defendant's[sic] about

12

Defendant Hodge being an informer—and any theory beyond these facts are strictly speculative.

(Id. at 19.)

In response, the Government argues that Petitioner fails to establish ineffective assistance of counsel and resulting prejudice, as required under Strickland.  (Doc. No. 1802 at 16.)  The Government responds that, although Appellate Counsel's initial brief argued that the evidence was insufficient to connect the stabbing to Hodge's status as a cooperator, it acknowledges that the following sentence in Appellate Counsel's reply brief may have supported the Government's claim:

> Despite the Government setting forth its own reasons why Atkinson may have had a motive to assault Carl Hodge, the confidential informant who was allegedly assaulted, the record is clear that Atkinson had little knowledge of the ongoing investigation being conducted with Hodge's assistance.

See (id. at 17) (citing Reply Brief of Petitioner-Appellant at 6, United States v. Atkinson, No. 18-01324 (3d Cir. Oct. 4, 2019)).  The Government notes that Petitioner "claims using the phrase 'little knowledge' was ineffective appellate advocacy because it signaled to the appeals court that their [sic] might be evidence [Petitioner] knew Hodge was cooperating."  (Id. at 18.)

Upon careful consideration of Petitioner's arguments, the parties' briefing, the record, and relevant authority, the Court concludes that Petitioner has failed to establish ineffective assistance of counsel as to his second claim.  Even assuming arguendo that Petitioner satisfies the first prong of Strickland, Petitioner fails to establish prejudice.  The Third Circuit properly rejected Petitioner's claim that the stabbing was independent of Hodge's cooperation on the basis of circumstantial evidence indicating that Petitioner and fellow gang members suspected that Hodge was an informant.  As noted by the Government, the contention that one sentence in Appellate Counsel's reply brief altered the appellate court's decision is "unfounded."  See (Doc.

No. 1802 at 19).  Petitioner has failed to point to any prejudice resulting from Appellate

Counsel's strategic choices.  The Court will therefore deny Petitioner's motion as to Ground

Two.

>C.    **Ground Three: Failure to Object to Jury Instruction Leading to an Aggregation Theory under 21 U.S.C. § 841(A)(1)**

Ground Three of Petitioner's motion asserts that Trial Counsel was constitutionally

deficient for failing to object to the Court's jury instruction related to the determination of drug

weight, leading to an aggregation theory.  (Doc. No. 1753 at 20.)  The jury, at trial, was allowed

to aggregate the drug weight over a period of time when considering Count 3 (21 U.S.C. §

841(A)(1)).[6]  However, on appeal, the Third Circuit found insufficient evidence to support the

verdict regarding the drug weight and that the Court's instructions were partially in error.  See

Williams, 974 F.3d at 364–67.  Multiple transactions over a period of time should not be

aggregated to determine the drug weight for a substantive drug trafficking offense.  See id.

(relying on United States v. Rowe, 919 F.3d 757, 759–60 (2019)).  Because Petitioner and his

Codefendants failed to raise the issue at trial, plain error review applied to the issue on appeal.

The Third Circuit concluded that "[t]here was sufficient evidence upon which a rational juror

could have concluded that these six Defendants [including Petitioner] were guilty under § 846

and were responsible for 280 grams or more of crack" and because of that conclusion, "the Rowe

error on Count [3] did not affect their substantial rights" because "[t]heir statutory maximum

terms of imprisonment would have been life even if the Rowe error had not occurred."  See id. at

373–74.

_____

[6]  "It shall be unlawful for any person knowingly or intentionally—(1) to manufacture,
distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled
substance . . ."  See 21 U.S.C. § 841(A)(1).

Petitioner, in his briefing, argues that the aggregation theory "infected each count of conviction." (Doc. Nos. 1753 at 20; 1817 at 4.) Petitioner posits that, with respect to Count 3:

> the jury was allowed to aggregate the drug weight over a period of time. For the conspiracy offenses, they were advised that in making this decision, they "should consider all controlled substances that members of the conspiracy actually possessed with intent to distribute or distributed."
>
> The jury was not asked to make an additional, individual determination of drug weight for each defendant. [Petitioner]'s [T]rial [C]ounsel did not object to these instructions nor did any other defendant.

See (Doc. No. 1817 at 4) (citations omitted). Petitioner asserts that Trial Counsel was therefore ineffective for failing to object to the jury instruction related to the determination of drug weight. (Doc. Nos. 1753 at 20–22; 1817 at 4.)

In its brief in opposition, drawing from the Third Circuit's opinion resolving Petitioner's direct appeal, the Government asserts the following:

> With respect to drug weight on the conspiracy counts, the Third Circuit explained a two-step process. The two-step process addresses the drug weight that is attributable for statutory maximum purposes under Apprendi [ v. New Jersey, 530 U.S. 466 (2000)] . . . and the drug weight attributable for mandatory minimum purposes under Alleyne [v. United States, 570 U.S. 99 (2013)]. To resolve the question of the statutory maximum, a jury must find the "quantity attributable to the conspiracy as a whole." To resolve what mandatory minimum applies to an individual defendant, a jury must be instructed to "attribute to a defendant only those quantities involved in violations of § 841(a) that were within the scope of, or in furtherance of, the conspiracy and were reasonably foreseeable to the defendant as a consequence of the unlawful agreement." In this case, the instruction given by the court corresponded with what a jury must decide to determine the statutory maximum punishment. In other words[,] there was no error when the jury decided that the drug weight attributable to the conspiracy was properly instructed and supported by the evidence. However, for the mandatory minimum, the jury instruction was insufficient because it failed to ask the jury to determine how much drug weight [Petitioner] was responsible for . . . .
>
> [The Third Circuit] went on to find that since the matter was not preserved, under plain error review, there must be a reasonable probability of a different result for a defendant to be entitled to relief. Since the sentence imposed for [Petitioner] (and other defendants) was above the mandatory minimum, the error did not affect his substantial rights and thus he was not eligible for relief.

15

> The same analysis applies here.  The statutory maximum for Count 1 (RICO Conspiracy) and Count 2 (Drug Trafficking Conspiracy) were properly found by the jury in accordance with <u>Apprendi</u>.  The jury was properly instructed to consider all of the drugs attributable to the conspiracy as a whole.
>
> With respect to the <u>Alleyne</u> [] mandatory minimum error, [Petitioner] received a life sentence which is well above the 10-year mandatory minimum applicable, thus he suffered no prejudice from the jury instruction.  Finally, with respect to the <u>Rowe</u> error, his sentence at Count 3 was totally concurrent with his sentences at Counts 1 and 2, and therefore he suffered no prejudice.  The Third Circuit's resolution of the prejudice issue should be dispositive of [Petitioner]'s claim on collateral review.

(Doc. No. 1802 at 20–23) (citations and footnotes omitted).

Having considered Petitioner's arguments and the record of these proceedings, the Court agrees with the Government that, even assuming <u>arguendo</u> that Trial Counsel performed unreasonably under the first <u>Strickland</u> prong by failing to raise an objection regarding the calculation of drug weight and statutory minimum and maximum terms of imprisonment, Petitioner has failed to establish prejudice under the second <u>Strickland</u> prong as to the <u>Rowe</u> error at Count 3.  As noted <u>supra</u>, under <u>Rowe</u>, multiple transactions over a period of time should not be aggregated to determine the drug weight for a substantive drug trafficking offense.  <u>See</u> <u>Williams</u>, 974 F.3d at 365 (relying on <u>United States v. Rowe</u>, 919 F.3d 752, 759–60 (2019)).  In the context of drug-trafficking conspiracy charges brought pursuant to 21 U.S.C. § 846 where "drug quantities are charged pursuant to [21 U.S.C.] § 841(b)(1)(c)," the "statutory maximum term of imprisonment is to be determined according to the amount of drugs involved in the conspiracy as a whole," whereas the mandatory minimum term is "determined only according to the aggregate quantity of drugs involved in those violations of § 841(a) that were within the scope of the conspiracy, or in furtherance of it, and were reasonably foreseeable to the defendant as a natural consequence of his unlawful agreement."  <u>See</u> <u>Williams</u>, 974 F.3d at 372.  Petitioner argues that he suffered prejudice as a result of the error.  Because Petitioner's Trial Counsel

16

failed to raise this issue at trial, plain error review applied to the issue on appeal.  The Third

Circuit concluded that "[t]here was sufficient evidence upon which a rational juror could have

concluded that these six Defendants [including Petitioner] were guilty under § 846 and were

responsible for 280 grams or more of crack" and because of that conclusion, "the <u>Rowe</u> error om

Count [3] did not affect their substantial rights" because "[t]heir statutory maximum terms of

imprisonment would have been life even if the <u>Rowe</u> error had not occurred."  <u>See id.</u> at 373–74.

Petitioner has failed to establish that "there is 'a reasonable probability that, but for the

error claimed,' the Defendants' terms of imprisonment would have been different."  <u>See

Williams</u>, 974 F.3d at 367 (quoting <u>United States v. Domniguez Benitez</u>, 542 U.S. 74, 82

(2004)).  Accordingly, Petitioner has failed to establish prejudice under <u>Strickland</u>'s second

prong and the Court will therefore deny Petitioner's motion as to Ground Three.

**D.    Ground Four: Failure to Object to the Sentence Imposed on Counts 1, 2, and 3, Resulting in Life Imprisonment Based on an Aggregation Theory**

Ground Four of Petitioner's motion asserts that Trial Counsel was ineffective during

sentencing because Trial Counsel failed to object to the sentences for Counts 1, 2, and 3.  In his

initial brief, Petitioner claims that his Trial Counsel was ineffective for failure to object to the

sentence as to Count 1 (RICO).  (Doc. No. 1753 at 22.)  He then states that "[t]he jury returned a

determination on a drug quantity that based on an aggregated theory of a drug conspiracy as a

whole incurred a mandatory minimum prison term of ten years and a statutory maximum of life

imprisonment."  (<u>Id.</u>)  Petitioner argues that, based on the jury's determination, he was sentenced

to life imprisonment "for an offense that by its statutory nature exceeds its provision for

sentencing purposes."  (<u>Id.</u> at 23.)  As to Count 2 (Drug Trafficking Conspiracy) and Count 3

(Drug Trafficking), Petitioner claims that Trial Counsel was ineffective for failing to object to

the sentences for these counts because the jury's decision was based on an aggregation theory—a

theory that Petitioner argues was improper.  (Id.)  In his reply brief, Petitioner contends that this

is a sentencing calculation error and that his sentence at Count 3 was totally concurrent with his

sentences at Counts 1 and 2.  (Doc. No. 1817 at 5.)

In response, the Government claims that collateral review does not provide an avenue for

relief as to a guideline calculation error.  See (Doc. No. 1802 at 23) (citing United States v. Folk,

954 F.3d 597, 602 (3d Cir. 2020)).  Additionally, the Government notes that Petitioner's Trial

Counsel unsuccessfully objected to the drug weight at sentencing.  (Id. at 24.)

Upon careful consideration of Petitioner's claim, the parties' briefing, the record, and

relevant authority, the Court concludes that Petitioner's fourth ground for relief fails.  As to the

Government's first contention, the Third Circuit in Folk stated that:

> Supreme Court precedent recognizes that § 2255 may remedy a nonconstitutional
> claim such as a flawed sentence in two circumstances. See [United States v. ] Doe,
> 810 F.3d [132, ] 155 [(3d Cir. 2015)] (noting that Reed v. Farley, 512 U.S. 339, 114
> S.Ct. 2291, 129 L.Ed.2d 277 (1994), explains how to fill the narrow space "between
> [the] poles"). First, if a sentencing error resulted in "an omission inconsistent with
> the rudimentary demands of fair procedure." United States v. Timmreck, 441 U.S.
> 780, 783, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979) (citation omitted). Second, if a
> sentencing error constitutes "a fundamental defect which inherently results in a
> complete miscarriage of justice[.]" Id.

See Folk, 954 F.3d at 602.  "[A]n incorrect guideline calculation does not constitute 'a

fundamental defect which inherently results in a complete miscarriage of justice.'" Nixon v.

United States, No. 17-cv-00563, 2020 WL 4194130, at *5 (W.D. Pa. July 21, 2020) (quoting

Folk, 954 F.3d at 604).  However, claims of ineffective assistance of counsel are not

procedurally defaulted.  See Massaro v. United States, 538 U.S. 500, 504 (2003) (holding that an

ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255,

whether or not the petitioner could have raised the claim on direct appeal).  To the extent that

Petitioner's claim in this regard is viewed as an ineffective assistance claim, the Court agrees

with the Government's second contention that Petitioner fails to demonstrate prejudice under Strickland's second prong because Trial Counsel objected at sentencing,[7] and Petitioner has not put forth evidence that he suffered prejudice.  Therefore, the Court will deny Plaintiff's fourth ground for § 2255 relief.

### E.    Ground Five: Failure to "Investigate Whether [the] Jury Pool Represented a Fair Cross Section of the Community Prior to Selecting the Jury"

Ground Five of Petitioner's motion argues that Trial Counsel was ineffective for failing to pursue a claim that the jury pool did not represent a fair cross section of the community or his peers.  (Doc. No. 1753 at 25; 1817 at 5.)  Petitioner asserts an ineffective assistance of counsel claim on the basis that his Trial Counsel had a "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  (Doc. No. 1817 at 5) (citing Strickland, 466 U.S. at 691).  Petitioner maintains that Trial Counsel:

> had the responsibility to assure that the jury pool contained a fair cross section of the community, and not to rely on what is a "usually" practice or someone else's investigation of the statistics.  The courts have held that the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof . . . .
>
> . . .
>
> Petitioner Atkinson's counsel had the provisions to investigate the status of the percentages of the prospective jurors to assure that it was equally proportionate to a fair cross section of the community.  Moreover, accompany Petitioner Atkinson's concerns, observation, and directions to check and investigate 'whether the jury pool represented a fair cross section of the community[']—the trial judge also raised concerns, and specific indications of a possible disparity and safeguard was advanced by the [G]overnment's contention that they will not strike anymore prospective jurors who identify as black or Hispanic.
>
> But even more obvious of the need to do an independent investigation into the percentages was the fact that Petitioner Atkinson's counsel knew that they had 500 jurors to pick from but only 120 were summoned (Pg. 851).  In other words, there

---

[7] See generally (Doc. No. 1413) (transcript of Petitioner's sentencing).

was an issue of whether the number of prospective jurors who were summoned were equivalent to a fair cross section of the community.

However, Petitioner Atkinson's counsel reliance only on what he termed as "usually," practice in terms of selecting prospective jurors was a deprivation of counsel's duties especially given the obvious concerns.

(Doc. No. 1753 at 26–27.)

In response, the Government states that this issue was litigated by defense counsel for all twelve (12) Defendants and the issue was found to be without merit and withdrawn, describing that:

> [t]he issue was first raised by co-defendant Rolando Cruz, Jr., <u>Motion for Discovery of Information Concerning the Confection of the Venire from which the Petit Jury will be Drawn</u>. The motion and supporting brief was joined by all codefendants, including [Petitioner]. In response, the government agreed in part and opposed in part. In doing so, the government confirmed that materials related to the jury make up was available for inspection at the Clerk's Office without the need for an order compelling discovery. This Court issued an order directing the production of certain information to the defense related to the composition of the venire. The defense conducted an investigation into the process employed by the Clerk's Office and found no basis for the claim.

<u>See</u> (Doc. No. 1802 at 25–26) (internal citations omitted). Although the Government concedes that Trial Counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," it maintains that this duty is within the realm of reasonableness and speculation that an investigation may support a claim does not render counsel's assistance ineffective. <u>See</u> (<u>id.</u> at 26) (citing <u>Strickland</u>, 466 U.S. at 691).

Upon careful consideration of Petitioner's claim, the parties' briefing, the record, and relevant authority, the Court concludes that Petitioner has failed to satisfy the second <u>Strickland</u> prong and, for that reason alone, cannot prevail on this claim. The Sixth Amendment provides criminal defendants the right to be tried by an impartial jury, and an essential characteristic of an impartial jury is that members are randomly selected from a "representative cross-section of the

community." See Lockhart v. McCree, 476 U.S. 162, 173–74 (1986). "However, the Supreme

Court has never required that a criminal defendant be tried by a jury that actually reflects the

composition of the community at large." Moore v. Luther, No. 19-cr-01127, 2021 WL 4976154

at *11 (W.D. Pa. Aug. 11, 2021) (citing Lockhart, 476 U.S. at 173–74); see also Taylor v.

Louisiana, 419 U.S. 522, 538 (1975) (holding that juries must be drawn from a source fairly

representative of the community, but declining to impose a requirement that juries actually

chosen must mirror the community). "[B]ut the jury wheels, pools or names, panels, or venires

from which juries are drawn must not systematically exclude distinctive groups in the

community and thereby fail to be reasonably representative thereof." Taylor, 419 U.S. at 538.

In order to establish a prima facie violation of the fair-cross-section requirement, a defendant

must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community;
>
> (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
>
> (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

See Duren v. Missouri, 439 U.S. 357, 364 (1979). As to the first prong, Petitioner argues that

there was a disparity because "the mass majority of [potential jurors] were white and older

white." (Doc. No. 1753 at 25.) Petitioner is black and asserts that he told his Trial Counsel that

there was "no way that [the potential jurors] would be able to differentiate how the youth or

people in general in his or any black neighborhood live, or function." (Id.) African Americans

are considered a distinctive group. See Weaver, 267 F.3d at 240 (stating that African Americans

are a "distinctive" group for the purposes of a fair cross-section analysis). As to the second

prong, Petitioner's contention must be supported by statistical evidence. See Duren, 439 U.S. at

364 (stating that "the defendant must demonstrate the percentage of the community made up of the group alleged to be underrepresented").  Although Petitioner discusses different comparative disparity percentages (Doc. No. 1753 at 26–27), he does not present evidence to establish a disparity in the instant case.  He instead argues that his Trial Counsel "had the provisions to investigate the status of the percentages of the prospective jurors to assure that it was equally proportionate to a fair cross section of the community."  (Id. at 27.)  Additionally, Petitioner's Trial Counsel joined Codefendant Cruz's motions concerning the jury venire, the latter of which was withdrawn after Defendants received a juror report of the demographic makeup of the people summoned.  See (Doc. Nos. 391, 495, 597).[8]

---

[8]  For context, Defendant Cruz filed a Motion for Discovery of Information Concerning the Confection of the Venire from Which the Petit Jury will be Drawn on July 13, 2015, and sixteen Defendants, including Petitioner, joined the motion.  (Doc. Nos. 391, 397.)  The motion was briefed by Defendants and the Government.  (Doc. Nos. 392, 409.)  On July 31, 2015, the Court issued an Order granting the motion in part and denying the motion in part, and in relevant part, ordered the Clerk of Court to immediately make available for counsel's inspection:

    a.  The source-lists from which the petit jury pool was created;

    b.  The total number of persons in the source-list or sources and the actual copy or copies of the source list or lists from which the initial selections were made;

    c.  The total number of persons at each subsequent step and the actual forms or materials used in those steps; and

    d.  Copies of the "Form JS-12" "Report[s] on Operation of the Jury Selection Plan Completed Pursuant to 28 U.S.C. § 1863(a);"

(Doc. No. 438 at 1.)  On August 18, 2015, sixteen Defendants filed a Motion to Reconstitute the Venire Based on a Disparity in its Racial Composition and for Additional Limited Discovery.  (Doc. No. 495.)  The Government filed a brief in opposition to the motion on August 28, 2015, opposing the substance of the motion but agreeing with Defendants that they should receive more jury-related discovery than previously allowed.  (Doc. No. 542.)  On September 1, 2015, the Court issued an Order directing the Clerk of Court to attach a demographic information report for the jury pool selected for the case ("juror report").  (Doc. Nos. 550, 550-1.)  That same day, the Court held a telephone conference with the parties during which the parties reviewed the juror report that provided the racial breakdown of the 500 venire persons summoned.  (Doc. No.

Finally, as to the third prong, Petitioner has not identified a suspect jury selection process that demonstrated "systematic exclusion" inherent in the selection process utilized.  See Duren, 439 U.S. at 366.

Even assuming arguendo that Petitioner satisfied the first Strickland prong, Petitioner advances no argument that, but for Trial Counsel's failure to pursue a claim that the jury pool did not represent a fair cross section of the community, "there is a reasonable probability that the outcome of the proceeding would have been different."  See Strickland, 466 U.S. at 694. Petitioner merely "speculates that further investigation would have resulted in an actionable claim, which would have resulted in a more diverse jury pool, which would have caused a different result."  (Doc. No. 1817 at 5.)  Petitioner has failed to point to any prejudice resulting from Trial Counsel's approach to the jury pool at issue, and therefore, the Court will deny Petitioner's fifth ground for relief.

F.    **Ground Six: Failure to Object to the Government's Witnesses who Allegedly Testified in the Capacity of Expert Testimony**

Ground Six of Petitioner's motion argues that Petitioner's Trial Counsel was ineffective for failing to object to the Government's witnesses who allegedly "testified in the capacity of expert testimony without adducing sufficient background information on their alleged specialized knowledge."  (Doc. No. 1753 at 27.)  Petitioner generally maintains that "nearly none of the government's agent, witnesses proffered any information on their alleged knowledge, skills, experience, training, or education concerning the conduct or methods of narcotics dealers but yet, testified to narcotics dealers' methods and other scientific procedures."  (Id. at 28.)

---

587.)  Thereafter, on September 3, 2015, Defendants filed a notice of withdrawal of the motion after review of the juror report.  (Doc. No. 597.)  Defendants averred that, after review of the percentages, they no longer believed that they could sustain their motion.  (Id. at 1 n.1.)

Petitioner focuses on five Government witnesses: (1) Detective Scott Nadzom; (2) Agent

Michael Oergel; (3) Agent Michael Bolf; (4) William Wentz; and (5) Larry Lawrence.  (Id. at

29–31.)

As to Detective Nadzom, Petitioner maintains that Nadzom testified as to how crack

cocaine was chemically manufactured (and as to particular chemicals used), but that Nadzom's

only qualifications were that he was employed as a York City Police Detective, participated in

the investigation of some Defendants, participated in the search warrant, and assisted as an

inventory officer.  (Id. at 29.)  Regarding Agent Michael Oergel,[9] Petitioner argues that Oergel

testified about extracting information from cell phones and computers as well as the operations

of phone companies.[10]  (Id.)  Petitioner posits that Oergel was employed with the ATF[11] as a

digital investigator "who provides support to other agents in the area of digital media computers,

cellphones and tablets," but Oergel did not provide "any information of training or education on

the testimony that he was about to provide nor the level of his knowledge and skill."  (Id.)  Next,

Petitioner argues that Agent Michael Bolf provided testimony similar to Oergel, describing how

to extract information from cell phones and laptop computers as well as how forensics software

---

[9]  Petitioner and the Government misspell Mr. Oergel's name throughout the briefing.  The proper spelling is Oergel.  See (Doc. No. 979 at 9, Tr. 1079:23).

[10]  Petitioner states that Oergel adduced expert testimony, describing the following: how to extract information from a phone; how Oergel himself has extracted information from a phone; how to access phones with encrypted passcodes; how iPhones, SIM Cards, and "GSM" phones operate; how Verizon and AT&T operate; how to remove hard drives from laptop computers and make forensic duplicates; how Oergel himself has used an extraction tool called XRY, which is manufactured by Micro Systemation AB; and how to debug a USB, among other things.  See (Doc. No. 1753 at 29).

[11]  The Court notes that ATF is an acronym for the Bureau of Alcohol, Tobacco, Firearms and Explosives.

is used.  (Id. at 30.)  Petitioner notes that Bolf was a Federal Marshal and Border Patrol Agent,

then an agent for the ATF as a digital media collection agent and nexus agent.  (Id.)  Petitioner

claims that Bolf provided no information about his training, education, level of knowledge, or

skill concerning the topic.  (Id.)  Petitioner also cites to Bolf's testimony that "all agents in the

same field do not possess the same full scope of knowledge, skill, experience, training or

education that would qualify to assist the trier of facts."  (Id.)  Petitioner states that Oergel and

Bolf's testimonies were "compiled" in order to "show that evidence obtained from cellphones

and laptop computers was a source to connect the defendants to the alleged racketeering

enterprise."  (Id. at 31.)  Another witness, William Wentz, testified that he was a York City

Police Officer who had gone undercover to purchase crack cocaine from Defendant Rice and

described the appearance of crack cocaine.  (Id.)  Petitioner argues that Wentz's testimony

regarding the appearance of crack cocaine is not within the "common knowledge of the average

juror" and that Wentz "did not provide the jury with any precondition of knowledge, experience,

training or education that he possesses to be able to describe the appearance of crack."  (Id. at

31.)  Finally, Petitioner claims Larry Lawrence, another Government witness, testified that he

encountered Petitioner when Petitioner was "a passenger in a stolen car and alleged that drugs

were found in the car" and that "when Petitioner [] was later searched two grams of crack was

found in his rectum."  (Id.)  Because his Trial Counsel failed to object to these witnesses,

Petitioner maintains that he suffered prejudice.  (Doc. No. 1817 at 6.)

In response, the Government first notes that Nadzom's testimony concerned cocaine and

drug materials from an apartment under Codefendant Hernandez's control.  (Doc. No. 1802 at

28.)  Additionally, the Government maintains that Nadzom's testimony about the practice of

introducing a cutting agent into powder cocaine or baking cocaine into crack should not be

considered expert testimony under Federal Rule 702 because the practice is widely known.  (Id. at 28–29.)  To the extent that Nadzom's testimony could be considered expert testimony, the Government argues that Petitioner suffered no prejudice because the Government could have qualified Nadzom as an expert if Trial Counsel had objected.  (Id. at 29.)  Finally, as to Nadzom, the Government asserts that, even if the Government had been unable to introduce Nadzom's testimony, "the testimony was not dispositive of [Petitioner]'s guilt" because Petitioner's "actual sales of cocaine were more compelling evidence of his drug trafficking than the circumstantial evidence found in his codefendant's apartment."   (Id.)  As to Oergel and Bolf, the Government argues that their testimony was "more lay witness than expert" and that Petitioner "does not point to any particular opinion testimony that these witnesses offered which was anything more than explaining how they performed their job."  (Id. at 29–30.)  As to the prejudice Petitioner allegedly suffered, the Government asserts that if counsel had objected to their testimony, it could have qualified the witnesses as experts based upon their experience, but in "any event, [Petitioner] fails to connect how any of the extraction evidence hurt his chances at acquittal" and "[i]t is unclear from the trial record where [Petitioner] was implicated by evidence extracted from these devices."  (Id. at 30.)  The Government does not specifically address the testimony of Wentz or Lawrence in its brief.

Upon careful consideration of Petitioner's claims, the parties' briefing, the record, and relevant authority, the Court concludes that Petitioner has failed to satisfy the second Strickland prong.  Even assuming arguendo that Trial Counsel erred by not objecting to the witnesses' testimony, under Strickland, Petitioner has not demonstrated that he suffered prejudice—that, but for counsel's failure to object to the challenged testimony, the outcome of the proceeding would

have been different.  See Strickland, 466 U.S. at 694.  Accordingly, the Court will deny

Petitioner's sixth ground for relief.

**G.     Ground Seven: District Court Erred in Using Relevant Conduct to Enhance Sentence**

As noted supra, Ground Seven is the only ground in which Petitioner does not allege a

claim of ineffective assistance of counsel.  Petitioner asserts that the Court erred in applying

sentencing factors/enhancements that were not charged or proven beyond a reasonable doubt,

and posits that "[a] fundamental premise of our Constitution is that it is not what one 'really'

does that can be punished, but only that conduct which is proven at trial."  (Doc. No. 1753 at 31–

32.)  He claims that facts that "warrant[] deprivation of a defendant's liberty or an increase in

that deprivation" must be proven to a jury beyond a reasonable doubt.  (Id. at 32.)  Petitioner

states that "clearly the relevant conduct in this case was never authorized by a jury's verdict" and

the Court "erred in applying the sentencing enhancements."  (Id. at 34.)

The Government responds by stating that misapplication of the Sentencing Guidelines

does not qualify as a basis for § 2255 relief.  See (Doc. No. 1802 at 31) (citing Folk, 954 F.3d at

602).  The Government notes that the Third Circuit has consistently rejected Petitioner's

assertions that sentencing enhancements must be charged and proven beyond a reasonable doubt.

See (id. at 31–32) (citing cases).

Having considered Petitioner's arguments, the briefing of the parties, and the record of

these criminal proceedings, the Court concludes that Petitioner's sentencing enhancement claim

fails for two reasons.  First, the Third Circuit rejected this challenge on direct appeal as to the

obstruction of justice enhancement, stating as follows:

> [Petitioner] contests the District Court's application of a two-level enhancement for
> obstructing the administration of justice.  To be eligible for that increase, a
> defendant must (as relevant here) have "willfully . . . attempted to obstruct or

impede[ ] the administration of justice with respect to the ... sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. While [Petitioner] was in prison awaiting sentencing, he allegedly stabbed Carl Hodge, a fellow prisoner, multiple times while the latter was in the shower. The proximate cause of the episode, according to Hodge's testimony at Cruz's sentencing hearing, was that Hodge came into possession of a cellphone Hernandez was using for ongoing illegal activities: bribing prison guards, selling drugs, and arranging a murder. Hodge began to share the phone's contents with the Government. Cruz and [Petitioner] became suspicious, leading to the assault.

[Petitioner] does not dispute Hodge's testimony. He argues, rather, that even if he had a motive to harm Hodge because of suspected cooperation, he could not reasonably have believed that Hodge would testify against him at sentencing. See United States v. Galaviz, 687 F.3d 1042, 1043 (8th Cir. 2012). Section 3C1.1 does not demand such a standard. Testimony at sentencing is only one means Hodge could potentially have disadvantaged [Petitioner]'s legal position. As the facts show, Hodge was cooperating with regard to contemporaneous events, disclosing potentially prejudicial material to the Government. To demand that [Petitioner] reasonably believed Hodge would testify against him is unduly limiting and beyond the text of § 3C1.1. "[T]he administration of justice with respect to" sentencing encompasses more than witness testimony.

From that perspective, [Petitioner]'s enhancement must remain. His "instant offense" was among other things RICO conspiracy, and Hodge was suspected of (and indeed was) revealing to the Government information related to ongoing concerted illicit activities of at least Hernandez, Cruz, and [Petitioner]. That goes directly to the offense of which [Petitioner] was convicted and awaiting sentencing. The District Court, then, did not clearly err in finding a nexus between the attack and [Petitioner]'s pending legal proceedings.

See Williams, 974 F.3d at 377–78. Additionally, Petitioner, along with Kelly and Eatmon, challenged the body-armor enhancement, but this challenge was also rejected by the Third Circuit:

Under the Guidelines, a defendant "convicted of a drug trafficking crime or a crime of violence" may be eligible for a two- or four-level increase to his offense level based on the use of body armor in the commission of the offense. U.S.S.G. § 3B1.5(1). The two-level increase applies when "the offense involved the use of body armor." U.S.S.G. § 3B1.5(2)(A). The four-level one applies if "the defendant used body armor during the commission of the offense, in preparation for the offense, or in an attempt to avoid apprehension for the offense." U.S.S.G. § 3B1.5(2)(B). Kelly received the latter enhancement; [Petitioner] and Eatmon the former.

28

Kelly asserts that Rogers's testimony does not provide a sufficient nexus between the wearing of the body armor and the commission of the offense. The commentary to § 3B1.5 defines "use" in part as "active employment in a manner to protect the person from gunfire." U.S.S.G. § 3B1.5 cmt. n.1. Kelly was said to have worn body armor multiple times on Maple and Duke Streets—the eponymous location of the primary crew of drug traffickers on the South Side. Further, Rogers's testimony was not an offhand remark; it came in the context of a description of the conspiracy's early years, when Kelly and Hernandez began supplying crack to Rogers, [Petitioner], Eatmon, and Rice. Kelly, Hernandez, and Cruz would be "standing there on Duke Street, so you would just buy the drugs from them and then go sell them on your own." App. 3546. It was also when Kelly and Hernandez helped to introduce guns to the South Side, and the South Side-Parkway rivalry escalated from fistfights to gunfights. There is, therefore, a spatial and temporal nexus between Kelly's use of the body armor and the commission of the conspiracy offense. Application of the four-level enhancement was not clear error.

This same evidence supports the application § 3B1.5(2)(A) to [Petitioner] and Eatmon. We apply to the Guidelines the ordinary principles of statutory interpretation. See, e.g., United States v. James, 952 F.3d 429, 433, 439 (3d Cir. 2020). The provisions here are notably different: while the four-level enhancement concerns the actions of the defendant, the two-level one concerns the nature of the offense. The latter—which encompasses "the offense of conviction and all relevant conduct," U.S.S.G. § 3B1.5 cmt. n.1 (citing U.S.S.G. § 1B1.1 cmt. n.1(I))—need only "involve[ ]" the use of body armor. According to Rogers's testimony, Kelly and Hernandez's use of the body armor occurred at the time [Petitioner] and Eatmon were being supplied by them. Eatmon protests he had not joined the conspiracy by this point, but he presents no evidence to question the District Court's judgment.

See Williams, 974 F.3d at 379–80.

The Third Circuit's consideration provides a basis to reject Petitioner's claim because it is settled law that "issues resolved in a prior direct appeal will not be reviewed again by way of a § 2255 motion . . . ." See United States v. Travillion, 759 F.3d 281, 288 (3d Cir. 2014). This rule embodies the "law-of-the-case doctrine, which provides that 'when a court decides upon a rule of law, the decision should continue to govern the same issues in subsequent stages in the same case.'" See United States v. Thomas, 750 F. App'x 120, 124 (3d Cir. 2018) (unpublished) (quoting Farina v. Nokia Inc., 625 F.3d 97. 117 n.21 (3d Cir. 2010)) (citing United States v. DeRewal, 10 F.3d 100, 105 n.4 (3d Cir. 1993)).

Second, assuming <u>arguendo</u> that the law of the case does not prevent reconsideration of the issue, the Court concludes that, under applicable Third Circuit precedent, Petitioner's sentencing guideline challenge is not cognizable in connection with a § 2255 motion. A § 2255 motion does not provide an avenue for relief from sentencing guideline errors, except under two circumstances. <u>See</u> <u>Folk</u>, 954 F.3d at 602. The first is where the sentencing error results in "an omission inconsistent with the rudimentary demands of fair procedure." <u>See</u> <u>Folk</u>, 954 F.3d at 602 (quoting <u>United States v. Timmreck</u>, 441 U.S. 780, 783 (1979)). The second is where the sentencing error is a "fundamental defect that inherently results in a complete miscarriage of justice." <u>See</u> <u>id.</u> at 604. As noted <u>supra</u>, "an incorrect guideline calculation does not constitute 'a fundamental defect which inherently results in a complete miscarriage of justice.'" <u>See</u> <u>Nixon</u>, 2020 WL 4194130, at *5 (quoting <u>Folk</u>, 954 F.3d at 604). Petitioner's sentencing enhancement challenge fails because he has not put forth evidence as to why such an argument is cognizable in connection with the instant § 2255 motion. Accordingly, for these two reasons, the Court will deny Petitioner's seventh ground for relief.

### H. Ground Eight: Failure to Conduct an Adequate Pretrial Investigation into Fines and Restitution

Ground Eight of Petitioner's motion asserts an ineffective assistance of counsel claim for Trial Counsel's alleged failure to conduct an adequate pretrial investigation into fines and restitution. (Doc. No. 1753 at 34–35.) As noted by the Government, this claim is largely undeveloped, with Petitioner stating merely that "[t]he court should not have imposed a fine in light of [Petitioner]'s financial condition" (<u>id.</u> at 35) and also that "he was denied his right to effective assistance of counsel because his [T]rial [C]ounsel failed to file a motion for severance, failed to object to the restitution order" (<u>id.</u>). The Government notes that Petitioner fails to offer evidence that his financial situation would have rendered him eligible for a reduced fine. (Doc.

No. 1802 at 32.)

The Court first clarifies that, at sentencing, the Court found that Petitioner did not have the ability to pay a fine and instead ordered him to pay a special assessment and restitution (to be paid jointly and severally with his Codefendants).  (Doc. No. 1413 at 68–69, Tr. 68:23–69:11.)  The Court also notes that a § 2255 motion is "not the proper method" to challenge a restitution order.  See United States v. Weicksel, No. 11-cv-02323, 2014 WL 2805241, at *6 n.5 (E.D. Pa. June 18, 2014); see also United States v. Knight, No. 94-cv-00032, 2008 WL 763305, at *1 n.2 (E.D. Pa. Mar. 20, 2008) (stating that "[p]etitions under § 2255 are not available to attack a restitution order because a petition under § 2255 must be claiming a right to be released").  In fact, "[e]ven if [P]etitioner can demonstrate that this alleged error meets the Strickland standard, attacks on an award of restitution are not cognizable on a § 2255 motion to vacate or set aside a petitioner's sentence."  See Boye v. United States, No. 16-cv-06024, 2018 WL 6061579, at *7 (D.N.J. Nov. 20, 2018).  "The plain and unambiguous language of § 2255 indicates that the statute only applies to "[a] prisoner in custody ... claiming the right to be released."  United States v. Trimble, 12 F. Supp. 3d 742, 745 (E.D. Pa. 2014) (citing 28 U.S.C. § 2255(a)).  The Third Circuit has stated that "[t]he payment of restitution . . . is not the sort of 'significant restraint on liberty' contemplated in the 'custody' requirement of the federal habeas corpus statutes."  See Obado v. New Jersey, 328 F.3d 716, 718 (3d Cir. 2003).  Therefore, "a challenge to a restitution order brought under the guise of an ineffective assistance of counsel claim is also not cognizable in a habeas petition because it does not seek release from custody."  See Trimble, 12 F. Supp. 3d at 746.[12]  Accordingly, upon consideration of the above authority, the Court

---

[12] "Indeed, almost every court of appeals to confront this issue has held that a petitioner cannot bring an ineffective assistance of counsel claim under § 2255 to challenge an allegedly erroneous restitution order or fine."  Trimble, 12 F. Supp. 3d at 746.

concludes that Petitioner's challenge to the restitution order is not cognizable on a § 2255 motion and the Court will therefore deny his eighth ground for relief.

## I.    Evidentiary Hearing

Section 2255(b) advises that a petitioner may be entitled to a hearing on his motion.  The decision to hold a hearing is wholly within the discretion of the district court.  See Gov't of V.I. v. Forte, 865 F.2d 59, 62 (3d Cir. 1989).  If "the files and records of the case conclusively show that the prisoner is entitled to no relief," the Court need not hold a hearing.  See 28 U.S.C. § 2255(b).  In determining whether a hearing must be held regarding claims of ineffective assistance of counsel, the Court must first "accept as true the nonfrivolous allegations in the petition" and then "determine whether, on the existing record, those claims that are nonfrivolous conclusively fail to show ineffective assistance of counsel."  See United States v. Dawson, 857 F.2d 923, 927-28 (3d Cir. 1988); see also United States v. Arrington, 13 F.4th 331, 334 (3d Cir. 2021) (applying standard as set forth in Dawson).  Here, assuming the truth of Petitioner's nonfrivolous allegations but not of the conclusory and speculative ones, the Court finds that he has conclusively failed to establish ineffective assistance of counsel as to any of his grounds for relief.  Further, as to Petitioner's claim concerning his sentencing enhancements, that claim is not cognizable in connection with a § 2255 motion.  Accordingly, the Court finds no reason to hold an evidentiary hearing in this matter.

## J.    Certificate of Appealability

In proceedings brought under § 2255, a petitioner cannot appeal to the circuit court unless a certificate of appealability ("COA") has been issued.  A court may not issue a COA unless "the applicant has made a substantial showing of the denial of a constitutional right."  See 28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could

disagree with the district court's resolution of his constitutional claims or that jurists could

conclude the issues presented are adequate to deserve encouragement to proceed further."

<u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003).  In this case, the Court concludes that jurists of

reason would not find the disposition of this case debatable.  Accordingly, the Court will not

issue a COA.

## IV.    CONCLUSION

For the foregoing reasons, the Court will deny Petitioner's § 2255 motion (Doc. No.

1752) without an evidentiary hearing and will not issue a COA.  An appropriate Order follows.

 s/ Yvette Kane_____<br>
Yvette Kane, District Judge<br>
United States District Court<br>
Middle District of Pennsylvania
